### THE GEORGE MURRAY.

*(District Court, N. D. Illinois.* May Term, 1884.)

1. COLLISION — FAULT—STEAMER AND SCHOONER — NIGHT—SPEED—CHANGE OF COURSE.

Upon examination of the evidence, *held,* that the steam-propeller Canisteo was alone responsible for the collision with the schooner George Murray, because of her negligence in not giving the schooner so wide a berth as not to have embarrassed or alarmed her, and in using too great speed for some moments before the collision, and after the danger of collision should have been apparent to her officers. *Held, further,* that the only change of course on the part of the schooner was made at the moment of extreme peril, and when allowable as an act *in extremis,* even when, if it had not been made, perhaps there might have been no collision.

2. SAME—LOOKOUT.

The precaution of a lookout is not indispensable when, from the circumstances, a lookout could not be of service, or when the officer of the deck is in full possession of all the information a lookout could possibly give.

Damages for Collision.

*Schuyler & Kremer,* for Wiley M. Egan, Petitioner.

*Robert Rae,* for Phenix Insurance Company.

BLODGETT, J. On the morning of October 14, 1880, a collision occurred in the waters of Lake Michigan, a short distance off Point Waugoschance, between the schooner George Murray and the steam-propeller Canisteo, in which the Canisteo was so badly damaged that she was beached within a short time after the collision. Wiley M. Egan, as owner of the schooner, filed a petition for limitation of liability, and the usual monition against all persons having any claims against the schooner was issued. The Canisteo was bound on a voyage from Chicago to Buffalo, with a cargo consisting in part of 15,000 bushels of corn on which the Phenix Insurance Company had issued a policy of insurance. The cargo of the Canisteo being a total loss by reason of the collision, the insurance company paid the loss, to the amount of $7,200, under the policy, and presented its claim for the amount in its own behalf, asking to be subrogated to all the rights

of the owner of the cargo, and claimed to be paid its proportion out of the appraised value of the Murray, on the ground that the collision in question occurred by reason of the negligent navigation of the Murray and neglect of duty by her officers and crew.   The allowance of this claim was resisted by Egan on the ground that the collision was brought about wholly by the negligence of those in charge of the Canisteo.   On the issue thus made as to negligence proofs were taken, and the commissioner has reported that the collision was occasioned by the fault of those in charge of the Canisteo, and not by reason of any fault on the part of the Murray.   To this finding by the commissioner the insurance company has filed exceptions which have been fully discussed by counsel.

The faults charged by the insurance company against the Murray, as a ground of recovery, are: (1) That the schooner, after she was sighted by the steamer, and when they were approaching each other, changed her course, and thereby caused the collision; (2) that the schooner had no lookout; (3) that the officer of the deck of the schooner neglected his proper duty at a time when his active vigilance and attention to the navigation of the vessel was demanded, to attend to other work belonging to his subordinates.   The testimony is voluminous and, as is usual in collision cases, contradictory in many important particulars.   It is, however, conceded on both sides that the collision occurred between half past 3 and 4 o'clock in the morning; that the night was clear and the wind about south-east,—a six to eight knot breeze; that the steamer, when she first sighted the schooner, was to the south and west of Waugoschance light, running about north-east, in the usual track of steamers approaching the entrance to the straits of Mackinaw; and that the schooner was to the north of the light, having just passed through the straits on her way to Chicago.   It must also, I think, be assumed as true, from the proof, that at the time the shooner was first seen on the steamer she had changed her course from about west, which she had been running while in the straits, to a south-westerly course, for the reason that the master of the steamer says he first saw the green light of the schooner, which would indicate that the schooner had passed sufficiently west to round point Waugoschance, and shaped her course for the Manitous.   This was about 20 minutes before the collision, and the vessels were then four or five miles apart, the steamer running about nine miles an hour, and the schooner about six miles an hour, making the united speed about fifteen miles an hour.

The mate of the Canisteo, who was the officer of her deck at the time of the collision, and is the principal witness relied upon by the insurance company, to show that the course of the schooner was so changed as to cause the collision, says that he first saw the schooner's green light, and that it bore about half a point on his starboard bow; that she kept her green light in view eight or ten minutes, and then showed a red light; that he then put the wheel of the steamer

to port, so as to keep her to windward of the schooner and show her his red light. Then the course of the schooner was changed, and she showed him her green light, whereupon he put his wheel to starboard so as to show his green light to the schooner. Soon after the schooner showed her red light again; whereupon the wheel of the steamer was put hard to port, and then the collision occurred the steamer striking the schooner just forward of her mizzen rigging, staving in the bows of the steamer, but doing comparatively slight damage to the schooner. Four witnesses, Greenwood, Rock, Jackson, and Mrs. Givens, who were on the schooner, are also called by the insurance company. At the time the steamer was sighted on the schooner the mate of the Murray was officer of her deck, and Greenwood and Rock were in his watch. When the course of the schooner was changed from that sailed while passing through the straits to the course for the Manitous, it became necessary to haul in her sails so that she would run closer to the wind. Rock had been acting as lookout, but was called by the mate to help him, the mate, and Greenwood, the other seaman of the watch, haul aft the main and mizzensheets. Rock states that he had seen the lights of the steamer and reported her to the mate before he went aft to help haul in the sheets. Greenwood says that while the mate, Rock, and himself were at work at the sheets, the captain came on deck; that he, the captain, looked over the lee side, which was the starboard side of the schooner, and said to the mate, "What light is that?" that they all looked and saw the green light and masthead light of the steamer, and that the steamer was then from one to two points on the schooner's starboard bow; that soon after the captain ordered Rock to show a torch, and while he was showing the torch, the captain shouted to the man at the wheel, "Hard up!" and the wheelman answered, "Hard up, sir;" that they immediately saw the steamer's lights first ahead, and then her red light on the port bow of the schooner, and then the collision occurred.

This witness' statements as to time are quite loose and uncertain, but his statement of the sequence of events is fairly clear. He was engaged in helping haul in the sheets, heard the captain ask what light that was, and the mate's reply; looked himself and saw the steamer's green light; then, and while witness was still at work at the sheets, the captain ordered a torch to be shown, and while the torch was being shown he ordered the wheel hard up; then the steamer crossed the bows of the schooner and showed her red light on the schooner's port side, and then came the collision. Rock states that while he was helping to haul aft the sheets, the captain came on deck, looked out, and asked, "What light is that to leeward?" The mate replied, "Some steamer bound down." The witness looked and saw the steamer's green light, then thought he saw her red light, but does not state how much time passed between the time he saw the green and the time he thought he saw the red light. The captain then ordered

a torch shown, and ordered the wheel hard up. He showed the torch for a sufficient length of time, then put it out, and gave the alarm to the watch below, and just as some of them got on deck the collision occurred; that after the wheel was put hard up, the schooner swung off to leeward, and was swinging to leeward when the collision occurred. The witness Jackson was in the watch below, and asleep when the alarm was given. He states that when he came on deck the schooner was paying off very fast, with the steamer on the schooner's port bow. He says, no sooner had the schooner paid off than the steamer walked right into her weather quarter. Mrs. Givens, the cook of the schooner, was in her room until the alarm was given. She testified that she saw the torch shown, and that, five or six minutes after it was put out, she heard the order to put the wheel hard up given. It is quite evident that neither Jackson nor Mrs. Givens saw anything until just the moment before the collision, and their testimony throws little light upon the circumstances which brought about the collision.

This is all the testimony as to the alleged changes of course by the schooner, and it will be seen that the witnesses on the schooner only testify to one change of course, and that was at or about the time the torch was shown. Some say the order to put the wheel hard up was given before, and some say it was given after, the torch was shown, and the concurrent testimony of these witnesses is, that at the time the torch was shown the danger of collision had become imminent. Indeed, it can hardly be supposed that the captain of the schooner would have deemed it necessary to show a torch on such a night—when the atmosphere was so clear that there was no difficulty in seeing objects like a steamer or schooner at quite a distance, without reference to their lights—if the maneuvers of the steamer had not been such as to create alarm or cause him to infer that, for some reason, those in charge of the steamer had not seen the schooner, and were not aware of the danger.

On the part of the Murray, we have the testimony of Capt. Hurlbut, Cassan, the man at the wheel, and Smith, the mate, that no change was made in the course of the schooner until just the instant before the collision, when the wheel was put hard up by order of the captain. Bracken, the mate of the Canisteo, states that at about the time he got the schooner's red light the last time he gave several sharp toots from his steam-whistle, and signaled to stop and back; but that these signals were hardly responded to before they struck, and Capt. Hurlbut says that the order "hard up" was given when he heard these whistles. Cassan, the wheelsman of the schooner, says the steamer was almost into the schooner when he got his order to put his wheel hard up, and that it was right after he heard the whistles and signals to back on the steamer.

This testimony is so probable, and in accordance with the natural course of occurrences, that I must say it seems to me much

more credible than that of Bracken, the mate of the Canisteo; especially when Bracken is uncorroborated in this material point. Both Smith, the mate of the schooner, and Capt. Hurlbut, who was on deck, and had assumed command certainly before there was any apparent danger of a collision, were experienced navigators, who must be presumed to have fully understood that best known of all sailing rules, and the one that the navigator of a sailing craft has, perhaps, most frequently in these days to apply: that a sail-vessel must hold her course, and a steamer is bound to keep out of her way.

Why, then, should this schooner's course have been changed? Any one who reads the proofs must be satisfied, I think, that the schooner had rounded Waugoschance and laid her course for the Manitous when the captain came on deck. The vessels were then four or five miles apart. The mate had made the course south-west. The captain directed it to be made south-west by south, and she was brought up to that course. This was no such change as would embarrass the steamer, for the steamer was to leeward of the schooner, and this change would carry the schooner still more to windward, and keep her green light still in view from the steamer. Capt. Hurlbut states that after he came on deck, and had made out the steamer's green light on his starboard bow, he noticed the steamer changed her course so as to cross his bows and show him her red light. He then directed the torch to be shown, and while it was burning the steamer passed clear across his bows and went off to windward, and that he next saw the steamer coming in upon his port quarter, when the order to put the schooner's wheel hard up was given. If Greenwood, Rock, Cassan, Smith, and Hurlbut are to be relied upon, if the truth can fairly be inferred or deduced from their testimony, there was no occasion for changing the schooner's course after it was made south-west by south, when the vessels were four to five miles apart, until the collision became imminent; and her officers knew she had no right to change it, under the circumstances, except in the immediate peril of collision. It is true, as suggested by the proctor of the insurance company, she was probably making some leeway, which would tend to carry her toward the track of the approaching steamer; but that is a matter which the steamer was bound to take notice of, and keep far enough away so that the schooner's leeway should not bring them together. But the matter which impresses me most is that the mate in command of the steamer was negligent in not giving the schooner a wider berth. From the time he saw the schooner, according to his own statements, they approached each other nearly heads on. This there was no necessity for him to do, and he ought not to have done it. He should have given the schooner so wide a berth as not to have embarrassed or alarmed her. He had ample sea-room to do this, and I see no excuse for his failure to do it. In fact, I see no good reason why this steamer, that was first sighted to leeward of the schooner,

should in so short a time have been found upon her windward side. I am satisfied that the only change of course made by the schooner was made *in extremis,* under the immediate peril of collision, and with the hope of thereby preventing or mitigating the effects of a collision. I am also of opinion that the speed of the steamer was too great for some moments before the collision and after the danger of collision should have been apparent to her officers.

The next point to be considered is the allegation that the schooner had no lookout. As to this there can be no doubt, from the proof, that Rock had been acting as lookout, and that he was fully competent for such duty, up to the time that the mate called him to help haul the sheets aft; before that time he had seen the steamer's lights and reported them to the mate. When the captain came on deck Rock was still working at the sheets, and the captain, seeing the lights, made inquiry about them, and the reply made to him by the mate shows that the mate. was aware of the approaching steamer, as his reply was, "It is some steamer bound down, I suppose." The mate, therefore, and the captain were both then fully possessed of all the information the most vigilant lookout could have given them. At that time there was no apparent danger. The vessels were running green to green, with the pathway of the steamer outside or to the westward of that of the schooner. The steamer could easily have gone off a point or two further, so as to have carried her clear away from the schooner's pathway, as there was no obstacle to have prevented her from doing so. ' The captain watched the steamer until he saw her going to windward instead of to leeward of the schooner, and when he saw her crossing the schooner's bows, so as to show him her red light, he deemed it a proper precaution to display a torch. The services of a lookout, for the purpose of informing the officers of the schooner of the proximity of this steamer, were not needed after the captain came on deck. The rule is fully settled that the precaution of a lookout is not indispensable when, from the circumstances, a lookout could not be of service, or when the officer of the deck is in full possession of all the information a lookout could possibly give. *The Farragut,* 10 Wall. 334; *The Fannie,* 11 Wall. 238; *The Milwaukee,* 1 Brown, 313; *The Franz Sigel,* 6 Ben. 550. I cannot, therefore, see that the temporary employment of the man assigned to the duty of lookout, in helping to trim the aft sheets, contributed in any degree to this collision. Nor did the fact that the mate was for the time attending to hauling in these sheets contribute to the collision, because the proof shows that even if this was incompatible with any other duty devolving upon him as officer of the deck, he was relieved from that duty by the presence of the captain, who assumed charge and became officer of the deck before there was any apparent danger.

I agree with the learned counsel for the insurance company that, in a case like this, if any substantial fault of the officers of the Mur-

ray contributed to bring about this collision, then, as to the owner of the cargo of the Canisteo, or this insurance company, who represents the rights of the owner of the cargo, the Murray is a *tort-feasor*, although there may have also been contributory fault on the part of the Canisteo. But I do not find in this proof, when fairly considered, any contributory fault on the part of the schooner. The testimony of Bracken, as to the repeated changes of course by the schooner, is not supported by the other witnesses called by the insurance company from the crew of the steamer or of the schooner; but, on the contrary, all the witnesses on the schooner who should best know what was done on board of her concur that there was but one change of course by the schooner from the time the vessels sighted each other when four or five miles apart, and after the schooner had passed through the straits, and shaped her course for the Manitous, and that this change of course was made at the moment of extreme peril, and when allowable as an act *in extremis*, even when, if it had not been made, perhaps there might have been no collision.

Some stress was laid at the argument upon the fact that the answer of Mr. Egan to the petition of the insurance company does not charge the fault of the collision upon the steamer, and exonerate the schooner from fault. It is evident that the proof has been taken without objection, so far as shown by the record, for the purpose of ascertaining who was at fault for the collision, and if the allegations in any of the pleadings are not broad enough to admit the proofs, they may be amended before the decree is entered.

The exceptions to the commissioner's report are overruled, the report confirmed, and petition of insurance company dismissed, at petitioner's cost.