## THE LA FAYETTE LAMB.

*(District Court, W. D. Wisconsin. 1884.)*

1. COLLISION — LIBEL — BURDEN OF PROOF — FAILURE TO COMPLY WITH LAW — DAMAGES.

   When the law provides that lights shall be carried by barges at certain hours and in certain positions, and a barge is run into which has not complied with the law, the burden of proof is upon the owners of the barge, in a libel for damages, to show that the damage did not result from the failure to comply with the law, and they cannot recover unless they so show.

2. SAME—DEROGATION OF LAW—CUSTOM.

   A custom cannot be set up in derogation of the strict requirements of a law, by those whose duty it is to comply with the law.

In Admiralty.

*John J. Cole,* for libelant.

*Wing & Prentiss,* for respondent.

BUNN, J. This is a libel brought by Jacob Richtman against the steam-boat La Fayette Lamb to recover damages sustained in the sinking of a barge loaded with stone through a collision between the said steam-boat and said barge upon the Mississippi river near Island No. 69, above Winona, on October 8, 1879. The libelant was engaged in carrying stone from Fountain City, Wisconsin, down the Mississippi river to the government works at Argo island, a little above Winona, and on the occasion when the collision occurred had the two barges loaded with stone in tow of the steam-boat Express, Capt. Peter E. Schneider being in charge, taking them down the river after dark on the evening of October 8, 1879, to deliver at Argo island. The steam-boat La Fayette Lamb was a raft-boat engaged in making regular trips between Beef slough, in Wisconsin, and Clinton, Iowa. The collision occured near Island No. 69, on the Wisconsin side, about 9 or 10 o'clock of a rather dark night.

Capt. Schneider testifies that he had his signal lights on the Express, one red and one green; that he first saw the Lamb when the Express was crossing from one side of the river to the other, and waited for the Lamb to blow the signal, but that she came pretty close without blowing, and that then he (Schneider) blew a signal for the Lamb to keep to the right, and that then the Lamb was far enough off to keep away from a collision; that it was the duty of the ascending boat to signal first, but the Lamb did not signal nor answer the signal of the Express. There were no lights at all upon either of the barges which projected about 25 to 30 feet in front of

the Express' bow. But after Capt. Schneider blew his signal, and just before the collision occurred, he sent a man with a lantern upon the bow of the larboard barge, who held the light he carried in front as high as his breast. The barges were heavily loaded with stone, so that they came but about two feet above the water. Capt. Schneider testifies that, instead of going to the right, as signaled, the Lamb went to the left, and in passing collided with the starboard barge attached to the Express, striking the forward starboard corner of the said barge near its bow; that when he observed that the Lamb was taking the left, he ordered the man with the lantern from the larboard to the starboard barge, where he arrived just before the collision occurred; and that the barge sunk in about five minutes from the time it was struck, about five to seven rods from Island No. 69. It was afterwards raised by libelant, but was damaged and the stone lost. Capt. Schneider says the collision occurred seven or eight minutes after he first sighted the Lamb. He also testifies that when the Lamb did not answer his signal he stopped the engines of the Express, and commenced backing, and almost stopped; that when he first saw the Lamb, the Express was hugging the west shore of Island No. 69; and that the Lamb was aiming straight across the river from Argo island, on the west or Minnesota side; but that there was room enough for the Lamb to have passed the Express to the right, and between the Express and Island No. 69. Again, Capt. Schneider says that the Lamb changed her course when he blew the whistle; that the Lamb was then coming straight up the stream before she went across the bow of the Express; that she was coming right for the Express, but changed her course, and went to the left instead of the right; and that the Express was headed straight down the river.

The testimony of Charles Moeckel, a fireman on the Express, corroborates that of Schneider in most respects, and tends to show that the Express was headed straight down the river, which runs south at this point; and that the Lamb, in crossing her bow to the left, ran into the barge when the Express was backing, the Lamb striking the barge about the center of the Lamb; and that the Lamb did not change her speed from the time she was first sighted until the collision occurred. He testifies, also, that the lights on the Express were properly displayed and in good shape, though the red light was not as bright as usual. He thinks before the whistle blew the Lamb was going to the right of the Express, but then changed to the left, crossing the Express' bow and striking the starboard barge of the Express. This witness says he cannot state whether the Express was stopped or not, but that her headway was checked by reversing the engines.

The tendency of the testimony from the La Fayette Lamb is quite different. From this it appears that Thomas C. Withrow was at the time acting as pilot and lookout upon the Lamb; that, as he was crossing over from Argo island to Island No. 69, he heard a boat whistle; that he looked and discovered a boat coming towards the

Lamb in a form which he describes as an angle of some 45 degrees, headed out from the shore towards the middle of the channel, about 200 feet away from the Lamb, above and to the right of the Lamb. He says that he saw but one very dim red light, and that they had no time to answer the signal; that he saw many other lights up the river, and one on a raft on the opposite side; and that he was looking at those lights, when the whistle first blew, to see whether they were coming or not. Says he had no warning of the Express before, she being under the shadow of the shore, and the night so dark he could not distinguish a boat unless there was a light to show it. He says there were no lights on the barges and but one on the Express; that when he heard the whistle he rang to reverse the engines and back; that the Lamb was straight up and down the river, going straight up; and that the Express was lying crosswise and quartering nearly across west of the river; that the signal one whistle indicated to go to the right, but he could not have done so, and that was why he stopped the boat and reversed her. He says they collided with him; that the starboard barge struck the Lamb midships on the starboard side; that the Express was from 200 to 300 feet from the east side out in the channel, off Island No. 69, at the time the collision occurred; that the Lamb was to the left or west side of the channel, and clear out of the way, as far as he could get handily, and that if the Express had been headed properly she would not have struck the Lamb, and that there was ample room for the Express to have passed; that if the Express had given direction to the Lamb to take the left, the collision would have been avoided. He says he did not see the barges at all until after the collision, and that in the Lamb's position they should have seen both lights, but that he don't think the Express had any green light lit; that it was one-half minute from the time of the whistle to the collision. Says the Lamb did not change its course, and had no time to do so; that the Express was going out from the bank, perhaps endeavoring to take the right, according to the signal; that the channel there was about 300 feet wide; and that a good channel runs close to the bank of Island No. 69. He says the Lamb was not going towards the Express, but the Express was headed, as above stated, towards the Lamb.

Frank Hufman, who was second engineer on the Lamb, was on watch at the time of the collision. Says they were within 200 feet when he heard the whistle; that he went into the engine-room, and the bell rang to stop and back, and that about the time the Lamb got to backing the boat hit; and it was not more than a minute from the time of the whistle to the collision. His testimony, and the other testimony from the Lamb, corroborates that of Capt. Withrow as to the position of the boats in the channel when the accident occurred. Says he could see no barges, but that the Express had two lights, both dim; but that there was none on the barges. He says if the bow of the Express had been straight down the river she would not have hit the Lamb; that

the Lamb was going about seven miles an hour. The captain of the Lamb, L. B. Hanks, was in bed and got up when the collision happened.

The evidence is very conflicting; and allowing both boats and the barges to have been properly manned and lighted, it would be a matter of great difficulty, from the testimony, to determine on which side the fault is shown to be, or whether it was not a casualty, without fault on either side. But I am inclined to think there are principles of law that will determine the case without deciding upon the mere weight of conflicting evidence. If there were any fault on the part of the Lamb which should make her responsible for the sinking of the barge, I think it must be a want of vigilance in discovering the Express in time to have avoided a collision. I think, from all the evidence, that the officers of the Lamb, as soon as the whistle of the Express was blown, did all they reasonably could to avert the danger, and if there was any fault it was in not keeping a sufficient vigilant watch and lookout to discover any danger that might be approaching in time to avoid it. But the engineers, or one of them, was on watch, and the pilot, Withrow, who was at the steerage at the time, was also on the lookout from the pilot-house; but neither of them discovered the existence or proximity of the Express or barges until it was probably too late to avoid a collision. Why did they not discover the Express and barges? It might be because they were not sufficiently attentive and vigilant in their respective stations, or it might be because the Express, or the barges she had in tow, were not properly lighted. By rule 10 of the board of superintending inspectors, it is required that all barges, when towed by steamers and navigated between sunset and sunrise, shall have their signal lights, as required by law, placed in a suitable manner in the starboard bow of the starboard barge and in the port bow of the port barge, which lights shall not be less than 10 feet above the water.

There is considerable doubt raised, even by the testimony from the Express, whether her own signal lights were in proper condition. I think the evidence as a whole shows that one of them, if they had two lights displayed, was very dim. But there is no claim that the law requiring a fixed light upon each barge was complied with. To send a man with a lantern upon a barge when danger has already become imminent, is no equivalent for having a fixed and permanent light at least 10 feet above the water. It was proved before the examiner, by the libelant, against the objection of the defendant, that it was not the custom on the Mississippi river to have a permanent light upon barges. But those whose duty it is to provide such lights for the benefit and safety of navigation cannot set up a custom in defiance of the plain requirements of the law, and if they do so they invite the law upon their own heads. And in case of a collision happening under such circumstances, the burden is upon the party so failing to comply with the law to show that such failure did not cause

the damage. *Waring* v. *Clarke*, 5 How. 465; *The Cherokee*, 15 FED. REP. 119; *The Oder*, 13 FED. REP. 272.

In this case the libelant has not shown that his failure to provide permanent lights upon the barges did not cause the accident, or that the collision would have occurred if such lights had been provided. On the contrary, it seems altogether probable, from the testimony, that if lights had been displayed in proper place upon the two barges that the collision would not have happened. It is evident the law in this case is much more reasonable than the proved custom of disregarding it. These flat-boats, heavily loaded with stone, but two feet above the water, and projecting 25 or 30 feet ahead of the steamer upon either side, out into the darkness of night, would seem to invite the very sort of danger which came in this case, and the need of having them well and sufficiently lighted, as the rule requires, seems obvious.

Libel dismissed, with costs.