THE NORTH STAR. THE SIR WILLIAM SIEMENS. THE ALEXANDER HOLLEY.

(District Court, W. D. New York. April 6, 1901.)

1. COLLISION—NAVIGATION OF ST. MARY'S RIVER—RULES GOVERNING.
    The special rules governing navigation in St. Mary's river, approved by Act March 6, 1896, take precedence of all general rules, where they apply, while, as to matters not covered by them, the general rules for navigation on the Great Lakes, embodied in the White law of February 8, 1895, and those promulgated pursuant to its provisions, govern. These statutory rules are mandatory, and evidence of prior usages and customs cannot justify their violation, but a vessel which disregards them must show, in case of collision, that their violation not only did not, but could not, contribute to the disaster.

2. SAME.
    Under special rule 5, governing the navigation of St. Mary's river, which requires an overtaking steamer desiring to pass, at any place where that is permitted, to signal, and the forward vessel to answer such signal, either assenting or dissenting, such agreement by signals is essential to authorize the overtaking vessel to attempt passing, and she is not justified in taking the failure of the forward vessel to answer her signal as an assent to the passing, and in acting upon it as such.

3. SAME—OVERTAKING STEAMERS—ATTEMPTING TO PASS IN VIOLATION OF RULES.
    Early in the morning a number of vessels, which had been moored through the night at Old Ft. Brady pier, in St. Mary's river, started to proceed down the river, through Little Rapids Cut, a narrow and difficult

channel, the entrance to which was about 1½ miles from the pier. Among these vessels was the large steamer Sir William Siemens, with her tow, the barge Alexander Holley, each laden with about 5,000 tons of ore, and the large freight steamer North Star. The Siemens first got under way, and had proceeded a quarter of a mile with her tow, on a 600-foot cable, when the Star started. On leaving the pier, the Star signaled her desire to pass ahead, which could only be done, under the rules, before the cut was reached, but the signal was not heard by the Siemens. When the Siemens was within 1,200 feet of the point where the turn was made into the cut, the Star, which was then abreast of the Holley, again signaled her intention of passing, which was immediately answered by the Siemens by four or more short blasts, which, under the rules, signified her dissent, and that it was not safe to pass. Another signal was answered in the same way, the Siemens keeping on at an increased speed, which was about the statutory limit. The Star persisted in her attempt to pass, and the two vessels made the turn into the cut nearly abreast the Star, going at a speed which was four miles in excess of the limit permitted by the rules. Shortly after the vessels came in collision. There was ample time and space for the Star to have stopped after receiving the answer to either of the signals, while, on the contrary, it was not prudent for the Siemens to stop in the short distance before reaching the cut, with her heavily laden tow following, and the current running three miles an hour. *Held*, that the Star was clearly in fault for disobedience of the rules in attempting to pass, after the refusal of the Siemens to assent, which she was not bound, under the circumstances, to do, and that she must be held solely liable, in the absence of evidence showing contributory fault in the Siemens, unless in extremis, and after the collision had become inevitable.

**4. SAME—CONTRIBUTORY FAULT.**

The fact that the lookout of the Siemens was not at his post at the time the Star's first signal was given, while a violation of the rules, was not a fault contributing to the collision, in view of the fact that the Star persisted in attempting to pass after the subsequent dissenting signals of the Siemens.

**5. SAME—ERROR IN EXTREMIS.**

Where one vessel has clearly been guilty of a statutory fault, which is sufficient to account for a following collision, she cannot charge the other vessel with contributory fault, except on clear evidence. An error in navigation, when in extremis, is not sufficient.

In Admiralty. Libel and cross libel for collision.

Goulder, Holding & Masten and Clinton & Clark, for libelant.

John C. Shaw, William B. Cady, and Joseph C. Dudley, for cross libelant.

HAZEL, District Judge. This is a cause for collision in Little Rapids Cut, between the steamer North Star, belonging to the Northern Steamship Company, and the steamer Sir William Siemens, of the Bessemer Steamship Company, on the morning of November 28, 1899. On the trial there was much discussion by counsel in relation to the rules governing navigation at the point of collision and in St. Mary's river. The briefs of counsel discuss the question exhaustively. An intelligent disposition of the points at issue requires its determination at the outset.

What are the rules to be invoked in this case, and where are they to be found? The general law regulating navigation on the Great Lakes and their connecting waters, at present in force, is the act of congress approved February 8, 1895, known as the "White Law."

In addition to the requirements contained in the act itself, the supervising inspectors of the United States were authorized to enact certain rules not inconsistent with the act, which, when approved by the secretary of the treasury, had the force of law. March 6, 1896, congress enacted a law providing for special rules and regulations governing the navigation of St. Mary's river. These rules have been promulgated, and at the time of the collision were in force. Such special rules for a particular locality, upon the principles of statutory construction, must take precedence over general rules, where the special rules apply, while at all other places, and even in the special places where the special rules do not cover the situation, the general rules of navigation must dictate the movements of vessels. The rules having special application, therefore, to this case, are entitled "Rules and Regulations Governing the Movements and Anchorage of Vessels in St. Mary's River," approved March 6, 1896:

"(1) No vessel ascending or descending the St. Mary's river shall proceed at a greater speed than nine statute miles per hour over the ground between the Turning Channel Gas Buoy in the northern part of Mud Lake and the northern float lights in Lower Hay Lake of the twenty-foot channel leading from Neebish Channel, nor between the crib light in Upper Hay Lake at the entrance of the twenty-foot channel of the Frechette and Little Rapids Cut and the government pier at Sault Ste. Marie, nor between the western end of Sault Ste. Marie Canal pier and Point Aux Pins Lighthouse.

"(2) No vessel shall pass or approach another vessel moving in the same direction nearer than a quarter of a mile between Everens Point and the northern end of the Dark Hole, nor between the first black spar buoy south of the gas buoy in the northern part of Little Mud Lake and the northern float lights in Lower Hay Lake of the twenty-foot channel leading from Neebish Channel, nor between the southern entrance of the twenty-foot channel of the Frechette and Little Rapids Cut and the crib light at the northern entrance of the Little Rapids Cut, nor between the western end of the Sault Ste. Marie Canal piers and Big Point.

"(3) All vessels navigating the St. Mary's river may pass other vessels moving in the same direction between Turning Channel Buoy in the northern part of Mud Lake and Everens Point; in Little Mud Lake between the northern part of the Dark Hole and the first black spar buoy on the south side of the gas buoy in the northern part of Little Mud Lake; between the crib lighthouse at the northern entrance of Little Rapids Cut and the government pier at Sault Ste. Marie; and between Big Point and the lighthouse at Point Aux Pins.

"(4) No vessel passing another vessel shall move at a rate of speed greater than nine statute miles per hour over the ground.

"(5) In case one steamer desires to pass another going in the same direction on said river, at a point where such passing is permitted by these rules, the pilot of the steamer astern shall, if he intends to pass the steamer ahead on the right hand or starboard side, indicate such intention by giving one short blast of the steam whistle, and if he intends to pass such steamer ahead on the left hand or port side, he shall indicate such intention by giving two short blasts of the steam whistle. Upon the pilot of one steamer astern of another giving such signal, the pilot of the steamer ahead shall immediately answer by giving the same signal; but if he does not think it safe for the steamer astern to attempt to pass at that point he shall immediately signify the same by giving several short and rapid blasts of the steam whistle; and under no circumstances shall the steamer astern attempt to pass the steamer ahead until such time as they have reached a point where it can be safely done, when said steamer ahead shall signify her willingness by blowing the proper signals, then the steamer ahead shall slacken to a slow rate of speed, and the steamer astern shall pass the overtaken steamer, giving the overtaken steamer as wide a berth as possible."

Early in the morning of November 28, 1899, five vessels were moored abreast, at the government pier, generally known as "Old Ft. Brady Pier," in St. Mary's river, ready to proceed down the river through "Little Rapids Cut," so called,—a narrow and difficult channel, 300 feet wide, where there is a current of two to three miles an hour. The distance between the lighthouse crib at the northern entrance to Little Rapids Cut and the government pier at Sault Ste. Marie is about 1½ miles. Little Rapids Cut is about four miles long from its northern entrance. The five vessels referred to were moored at the government pier in the following order: North Star, tied to the pier; the Pennsylvania, with barge in tow abreast; Sir William Siemens and her consort, Alexander Holley, made fast abreast the Pennsylvania's tow. The North Star is 300 feet over all, keel 299 feet, beam 40, gross tonnage 2,400, full speed 12 miles per hour, and at the time of the collision was drawing 16.8 feet of water, laden with package freight, and bound from Duluth to Buffalo. The total length of the Sir William Siemens was 432 feet over all, her keel 413 feet, 48 feet beam, and at the time of the collision she was drawing about 18 feet of water. The Alexander Holley is 361 feet over all. The Siemens carried 5,222 and her tow 5,000 tons of iron ore. At about 6 o'clock in the morning, bright and clear, just about sunrise, the steamers Angeline and Hackett came through the ship canal, and passed down the river without stopping. They passed the moored vessels, the Angeline going ahead, the Hackett signaling to the Siemens, which at the time was getting under way, and was even then ahead of her tow. The masters of the Angeline and Hackett, when in Little Rapids Cut, heard signals afterwards given by the North Star to the Siemens, and, being attracted thereby, observed the North Star and Siemens abreast, making the turn into Little Rapids Cut at the northern entrance by the crib light. The Siemens was the first of the moored vessels to get under way, and had previously proceeded out into the river, and made up her tow, using about 600 feet of steel cable. The cable was wound on a drum by an automatic towing machine, which paid out the cable speedily, and without interference, in getting under way. She therefore quickly chose her course, and was soon moving at a rate between 6 and 7 miles an hour through the water, or 8 or 9 miles over the ground. The Siemens headed to the south of the Bayfield Ranges, distant about 1¼ miles, in a northerly direction from the government pier. When passing the red can buoy at the Bayfield Rock, her captain, who was on the bridge over the pilot house, heard the North Star blow two blasts of the whistle, indicating her intention to pass the Siemens on the left or port hand, as provided by treasury rule 5. This was in that part of St. Mary's river between the government pier and the crib lighthouse, at the northern entrance of Little Rapids Cut. The North Star at this time, having cleared the government pier, was abreast the Siemens' tow. The captain of the Siemens immediately responded to the signal given when the North Star was abreast the tow, by five or six rapid blasts of the steam whistle, as testified to by him and by others on the Siemens and the barge Holley, intending to give

notice, as required by rule 5, that he did not think it safe for the steamer astern to attempt to pass at that point. The witnesses for the North Star who heard the Siemens' reply say that it consisted of four distinct blasts of the whistle. These whistles were interpreted by the captain of the North Star as assenting signals, and indicative of the Siemens' desire to have the Star "come on and hurry up." Considerable expert evidence was given on the trial by respondents to establish that four blasts of the whistle are generally understood by navigators of the lakes as an invitation to "come on and hurry up," and that at the time of the collision it was the practice to so interpret that signal.

Proctors for respondents strenuously urge on the consideration of the court the case of The Maurice B. Grover (D. C.) 79 Fed. 378, affirmed in 34 C. C. A. 616, 92 Fed. 678. That case was decided in 1897, before the treasury rules relating to the St. Mary's river were promulgated. From an examination of the facts in that case, it appears that the steamer Moran went aground in the St. Mary's river near the light crib at Sailor's Encampment Island. The Grover gave the usual bend whistle to warn approaching vessels that she was coming down the river. The Moran gave no signal to the Grover, but just previous to the collision she blew a signal of four blasts for a tug to come to her assistance. The tug answered the signal, but those in charge of the Grover swore that they did not hear the answer. The court said: "A signal of four blasts may mean a call for a tug, or it may mean, 'Hurry up,' depending upon the length of the blasts." The record of the Grover Case shows that the blasts of the whistle were ordinary blasts, and that the Moran was aground; while in this case the Siemens was speeding towards the turn, increasing her speed as she went. There is no difficulty in differentiating and classifying sound emanating from a steam whistle on a lake steamer. There is no substantial claim that the blasts of the Siemens' whistle were other than such as caused an impression on the witnesses who heard them that there was apparent trouble or danger. The claim of the respondents that a four-blast whistle is commonly understood and interpreted by navigators of the lakes as a "hurry-up" signal can have no substantial bearing upon this controversy. Treasury rule 5 is mandatory. Whatever custom or usage was in vogue prior to the enactment of the rule must yield to the provisions of the statute. The John L. Hasbrouck, 93 U. S. 406, 23 L. Ed. 962; The La Fayette Lamb (D. C.) 20 Fed. 322; Steamship Co. v. Smith, 20 C. C. A. 419, 74 Fed. 267; The Clement, Fed. Cas. No. 2,879. And again, in The Lansdowne, a case recently decided, and reported in (D. C.) 105 Fed. 436, Judge Swan said: "Both the American and English courts hold that where a vessel has disregarded a rule of navigation it is incumbent upon her to show, in case of collision or other disaster, that violation of the statute not only did not but could not have contributed to the collision." If these rules were not promulgated for the benefit of commerce and trade, and to minimize the dangers attending navigation, and to enforce the inhibitions and restrictions contained in them, what purpose was intended by their enactment? They must be observed and

enforced by navigators of the lakes, and of their rivers and channels, in all cases where they apply.

Witnesses for the libelant testify that the whistles of the Siemens were five or six short and rapid blasts. Other witnesses for the libelant testify that the blasts of the whistle were four or more short and rapid blasts. Capt. Saunders, of the steamer Hackett, when the first reply of the Siemens was sounded, says that as he proceeded on his course he heard several short and rapid blasts, conveying to him a signal of danger and alarm. He looked astern, and saw the Siemens and her consort a short distance above the Bayfield Rock, coming down the river; the North Star then being a little astern of the Holley. After a short interval two blasts were again sounded by the Star, and the Siemens again replied with several short and rapid blasts. The North Star was then abreast of the Holley, at Bayfield Rock. Durand, master of the Holley, says that the Siemens twice blew six short blasts. Capt. Gunderson, master of the Siemens, says that his reply to the signals of the Star was several short and rapid blasts of the whistle,—six or more in number. He was then going under half speed, and gave an order to the engineer to go slow, preparatory to making turn at the bend. Tear, the mate of the Siemens, heard several short and rapid blasts of the whistle, but cannot tell the number. Rae, master of the Pennsylvania, says that there were as many as four blasts of the whistle, and he would take them for danger signals. Other witnesses for the libelant gave testimony that four or more short and rapid blasts of the whistle are not understood by navigators of the lakes as a reply to "hurry up and come on," but are invariably understood to mean alarm and danger. The preponderance of the evidence shows that the answers of the Siemens to the signals of the astern vessel were danger signals, and were sounded in compliance with treasury rule 5. The word "several" is commonly understood to imply more than two, but not very many. It must, therefore, be accepted as undisputed in the case that several blasts of the whistle were blown in answer to the passing signals of the North Star. I am satisfied from the proofs that the blasts of the whistle were short and rapid blasts, not less than four in number. It is clear that there was no justification or defensory propriety in misunderstanding the signals that were sounded by the Siemens, in view of the situation of the vessels and the manner of sounding the whistle by the Siemens. The North Star was the overtaking vessel, going in the same direction as the Siemens and tow. The obligations of precaution and care imposed on her as an overtaking vessel were most flagrantly violated and set at defiance. There may be said to have been a deliberate intent to pass the Siemens and tow, irrespective of laws or rules governing the movements of vessels in St. Mary's river, and for the express purpose of being the first to reach the channel, where passing is prohibited. Navigators of vessels on the lakes must be presumed to have knowledge of the rules and laws governing St. Mary's river. The captain of the Star had actual knowledge of these rules, and yet, without observing or giving heed to an important restriction, he attempted to pass the vessel ahead without receiving an as-

sent. The Siemens and tow at the time that the North Star cleared the government pier were a quarter of a mile distant, heading for a narrow channel 1½ miles from the pier. Moreover, the North Star had the Siemens in full view during her entire attempt to injudiciously pass the Siemens before reaching the turning point at the lighthouse crib. The speed of the Siemens was increased to almost the statutory limit immediately after the reply was sounded by the Siemens to the Star's declared intention to pass on the port side.

In view of the law, and the facts applicable thereto, I do not hesitate to find that the North Star, in her attempt to overtake and pass the Siemens without first receiving the signal prescribed by treasury rule 5, was at fault. The question of contributory fault by the Siemens, at the point where the turn by both vessels was made, is not free from difficulty. The North Star's negligence in coming abreast of the Siemens, and in attempting to pass her without receiving the assenting signal required by law, did not justify the collision, if it could be avoided by the exercise of proper care. The claim of the North Star is that the Siemens' master intended to prevent, and endeavored to prevent, the Star passing, not only by wrongfully accelerating the Siemens' speed, but also by crowding the Star, and by wrongfully directing his course to port just as the Star was about passing clear, thereby precipitating the collision. Capt. Stewart testified that after receiving the last four-blast signal he was not overtaking the Siemens as fast as he had the Holley; that the tow was increasing its speed. Nevertheless, the Star, at a time when prudent seamanship prompted reversing or checking, increased her speed, with the apparent object of overtaking the Siemens before reaching the prohibited channel. I think the preponderance of the evidence shows that it would not have been prudent seamanship for the Siemens to reverse at this time. The Siemens and Holley were laden with iron ore. The length of the tow from the bow of the Siemens to the stern of the Holley was approximately 1,500 feet. The distance from Bayfield Rock to the turn into Little Rapids Cut is 2,700 feet. The Siemens, therefore, was 1,200 feet from the turning point, and within 200 feet of the place where maneuvering is ordinarily commenced to make the necessary turn into the channel, at the time signals were first sounded. Both vessels were then going, approximately, the statutory limit of nine miles over the ground. Obviously, the master of the Star must have been aware of the imprudence of the attempt to overtake the Siemens. There was no obligation on the part of the Siemens to give way. The Governor, 1 Abb. Adm. 110, Fed. Cas. No. 5,645. The Siemens at this time had performed the duty imposed on her by statute. Her master had signified that it was not safe for the Star to pass. It is claimed by the Star that the testimony of the witness Geary, who up to the time of collision was wheelsman on the Siemens, establishes that the Siemens crowded the Star out of her course, and that she was at fault in directing her course to starboard. The claim is that starboarding brought the Siemens over towards the side the Star had signaled she desired to take. In that way her course was impeded. This is denied by the master of the

Siemens and other witnesses on board the Siemens and Holley. The Siemens had proceeded in her usual and ordinary course. The Star obstinately pursued her course, and was soon abreast the Siemens, causing her to sheer to starboard. Both vessels made the turn into Little Rapids Cut at the black stake nearly abreast. The Siemens made the turn at the light crib leading into the cut close to the can buoy,—considerably closer to the buoy than was ordinarily deemed necessary. The turn was to starboard about four points. The Siemens ported her helm. Her helm failing to respond readily, she hard a-ported, and, with the aid of a "kick ahead," made the turn at the bend, and proceeded down the cut. A "kick ahead" increases the velocity of the screw, and brings the current from the propeller wheel against the rudder in making the turn. At this time the Star's bow was amidships of the Siemens, and 30 feet distant. The Siemens checked to half speed. The Star drew swiftly alongside at a rate admitted by her master to be 13 miles an hour over the ground. The Siemens immediately steadied after the turn was made on the west bank of the cut. The Star kept forging ahead, and when her boiler house was abreast the Siemens' pilot house the impact took place. The Star swung across the channel, striking the west bank of the river. The stern anchor of the Siemens was let go, and the current caught her stern, shifting her ahead past the Star, 200 feet from the point of collision. The Siemens' bow was imbedded in the clay bank, with her stern swinging across the channel. The North Star was on the east bank.

The evidence is conflicting as to whether the collision was due to a sheer of the Siemens to starboard at the time the Star was alongside, and swiftly passing, or whether it was due to failure of the Siemens to efficiently manage her port helm. Wheelsman Geary says the Siemens' starboarding when she was near Bayfield Rock brought her over to the northward of the course, and over towards the side the Star had signaled she would take; that the Siemens took a broad turn at the crib in order to unduly crowd the Star out of her course, and to prevent her from passing; and that if she had hard a-ported her wheel at all it was after the collision. The conduct of this witness after the collision, and his statements to impeaching witnesses, are not such as to inspire confidence in his testimony. The evidence of the Siemens' wheelsman Ferris shows that he was near the wheel, and ready to relieve Geary. While he had charge of the wheel he received an order to "port more" and to "hard a-port," but on cross-examination he says that the Siemens was not hard a-ported until after the impact. Respondents' witness Sweet says that the Siemens' bow was from 400 to 450 feet from the crib when she struck the Star, and that she was further from the crib than he ever saw a boat go before. But I believe the weight of the evidence establishes that the turn was made by the Siemens close to the black stake.

Celerity was the chief object of the Star. Her speed steadily increased from the time she signaled the ahead vessel at the Bayfield Rock, so that within a half mile her bow passed the ahead vessel, going at the rate of nine miles an hour. I conclude that the Star

anticipated her greater capabilities for speed would permit her safely to overtake the vessel ahead. When she arrived at the bend there was abundant navigable space, so that she could have reversed or checked with absolute safety. Instead of pursuing this prudent course at the time the Siemens ported her wheel and steadied for the narrow channel, she followed the Siemens around the bend. Her captain says: "The Siemens steadied her wheel, and I steadied the Star, and he ran probably a length, and then started to port again, and I did the same thing, and I ran down that way about on a line with the east edge of the cut, just barely enough to clear the red can buoy."

Respondent's evidence does not make it clear that the seamanship of the Siemens, when making the turn or when lower down in the channel, was such as to impute to her such fault or careless navigation as would hold her in any degree responsible for the collision. Assuming that when the collision became imminent the Siemens did not hard a-port her helm, it yet appears that the collision was then unavoidable. If the Siemens did commit any error of seamanship while in this situation, I regard it as one committed in extremis, and therefore excusable.

It was held in The George L. Garlick (D. C.) 91 Fed. 920:

"When fault is traced clearly to a vessel, the innocent vessel will not be adjudged in fault for failure to avert the consequences of the fault of the first vessel, unless it be made very plain that departure from her first duty was demanded imperatively by new conditions, and that a person of good judgment at the time and place would have made such departure."

And in The City of New York, 147 U. S. 73, 13 Sup. Ct. 216, 37 L. Ed. 85, Justice Brown, speaking for the court, said:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption, at least, adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

There is a conflict of evidence as to the locality of the impact between the Siemens and Star. Whether it occurred at the bend, or in the prohibited channel, about 1,200 feet below, is not material. It satisfactorily appears from the evidence that the barge Holley was abreast the lighthouse, 70 feet from the black stake where the turn was made. When we give consideration to the length of the tow and to the evidence of Capts. Gunderson and Stewart, it is clear that the vessels came together about 800 feet from the bend. There was crowding and backing, resulting in the Star settling on the easterly bank of the cut, about 400 feet from the point of collision. The Siemens brought up on the westerly bank of the prohibited channel, with her stern towards the east. The Holley, having broken her anchor chain in her endeavor to stop after the first impact, came up, striking the starboard quarter of the Siemens, forcing her against the Star.

Respondents claim that the Siemens and Holley were each at fault in not keeping a proper and sufficient lookout; that the Siemens was particularly at fault in its failure to immediately respond

to the Star's signal when she arrived at the government pier. Proofs offered on the trial render it only necessary to consider the alleged fault of the Siemens. She cannot be held for contributory fault because of the failure of her captain to hear the first passing signal sounded by the star immediately after she left the government pier, although treasury rule 5 for St. Mary's river and pilot rule 6 require the steamer ahead to immediately answer a passing signal. No presumption of acquiescence or of concurrence can arise, under the rules of navigation applicable to St. Mary's river, from failure by a vessel ahead to sound an assenting or dissenting signal. Passing a vessel going in the same direction is prohibited, unless a mutuality of purpose be established. Communication between the overtaking vessel and the vessel ahead, by signals of the character and number prescribed by law, is absolutely essential. Manifestly, the interchange of signals by blasts of the whistle must plainly indicate the manner in which the vessel astern intends to pass, and likewise when such passing may safely be done. Silence on the part of the Siemens, when the initial North Star signal was sounded, should have insured circumspection and deliberate wariness by the North Star. The captain of the Siemens testified that he did not hear the Star's first signal; that the first whistles that he heard were when the Siemens was abreast the Bayfield Rocks. It may well be that he was so occupied at the time that the first signals were not heard. The failure to hear the North Star's whistle was not a contributory cause of the collision. It in no sense misled the North Star; for when her signals were repeated they were answered, and such answer gave abundant time for the North Star to keep away by reversing or checking her speed. It was held in the case of The Florence (D. C.) 68 Fed. 942, that silence was practically equivalent to an expressed dissent. In The Orange (D. C.) 46 Fed. 411, it was held that the fact that no reply to a signal came from a ferryboat was notice that the signal had not been heard, and that it was the duty of the vessel sounding the signal to stop at once. The court said: "Had she stopped, there would have been no collision. Instead of stopping, she kept up her speed, and by so doing she brought herself directly in front of the ferryboat, then heading for her slip, and made collision inevitable." In The Pavonia (C. C.) 26 Fed. 106, it was held that, "when the boat having the right of way fails to respond to the signal of the boat whose duty it is to keep out of the way, the latter has no right to assume, because of such silence, that the former abandons her right of way." The Siemens' lookout was not at his post when the Star's first signal was sounded. Neither was this a contributory fault. The Farragut, 10 Wall. 334, 19 L. Ed. 946; The Fannie, 11 Wall. 238, 20 L. Ed. 114; The George Murray (D. C.) 22 Fed. 122. This violation of rule 28 of the White law, in view of the North Star's endeavor to pass without receiving an assent, had nothing to do with the disaster. I conclude that the Star alone must be held responsible for the collision. A decree will be entered accordingly. The cross libel is dismissed, and the cause may be referred to a commissioner to ascertain and report the damages.